**In the Matter of HUTTER CONSTRUCTION CO., INC., Debtor.**

**Bankruptcy No. 88–05354–RAE.**

United States Bankruptcy Court, E.D. Wisconsin.

May 13, 1991.

AMENDED DECISION ON APPLICA-
TIONS FOR COMPENSATION FOR
MICHAEL, BEST & FRIEDRICH

RUSSELL A. EISENBERG,
Bankruptcy Judge.

## BASICS

This Decision pertains to all fee applications of Michael, Best & Friedrich ("MB & F"). Since this case was commenced on December 5, 1988, MB & F has represented the debtor, Hutter Construction Co., Inc. ("HCCI"). It also represented two other related Chapter 11 debtors, THCC Corp. ("THCC") and Acqui Holding Corp. ("Acqui" or "AHC"). All three cases were commenced on the same day. Substantially all assets available for creditors with unsecured claims were in the HCCI case. No dividend for unsecured creditors was likely in the AHC or THCC cases. All three debtors essentially had the same principals. On January 11, 1989, the court granted the motion of the debtors for joint administration of the three cases. At a hearing on July 18, 1990, the court directed that the proposed plan of HCCI be confirmed and that the THCC and Acqui cases be dismissed.

MB & F is seeking compensation in the sum of $298,447.05 through the conclusion of the trial on April 19, 1991. Of that sum, $282,119.14 is for legal services, and $16,327.91 is for reimbursement of expenses. Objections to the requested compensation were filed by the United States Trustee, Hutter Investment Company ("HIC") and American Insurance Co. ("AIC"). At the trial, the only person actively pursuing the objections to the MB & F compensation was the United States Trustee. All other objecting parties acted only upon the shirttails of the United States Trustee. The court precluded them from participating at the trial, as they neglected to file the requisite Joint Trial Statement.

Throughout this case, all creditors with secured claims, and approximately 90% in dollar amount of creditors with unsecured claims, were actively represented by legal counsel.

The positions of MB & F are that:

John R. Byrnes, Office of the U.S. Trustee, Milwaukee, Wis.

Martha E. Sperry, Lord, Bissell & Brook, Chicago, Ill., for Clair Hutter.

Charles G. Crosse IV and Paul S. Medved, Milwaukee, Wis., for Michael, Best & Friedrich, S.C.

Floyd A. Harris, Polacheck and Harris, Milwaukee, Wis., Bruce Gillman, Tomlinson, Gillman & Rikkers, Madison, Wis., for AIC American Ins. Co.

1. It is entitled to compensation from HCCI for postpetition services rendered to all three debtors;
2. The Court must base its award on its services rendered in all three cases, not solely in HCCI; and
3. The fee determination must be made after analyzing its requests for compensation utilizing all recognized methods of computation, and then awarding MB & F compensation computed by the method most favorable to it.

### THE FACTS

MB & F did not maintain separate time records for its services and expenses rendered in each of the three cases. All time records, for all three cases, were kept under HCCI, that is, HCCI was being charged, according to the MB & F time sheets and slips, for legal services rendered to all three debtors. It is impossible for the court to determine what services were rendered in each of the three cases. Counsel for HCCI acknowledged that the division of fees between the three debtors was merely an estimate, an allocation. MB & F acknowledged that the allocation of services among the debtors "was a terrific nightmare." It was a "near impossible, if not impossible, task." It was "a near impossibility of precisely allocating time." That made it easy for MB & F to charge all of its services to HCCI, which it did, as that was where the assets were. MB & F then sought compensation from HCCI for services rendered in all three cases.

Early into this case, it became clear that the HCCI case involved a liquidation, not a reorganization. In retrospect, the case should have been converted to Chapter 7 at that time. Although HCCI had some jobs in progress, and those jobs had to be completed, that was not a problem by the Disclosure Statement stage. By that time the debtor did not have sufficient working capital to continue to operate. If the case had been converted to Chapter 7, a Chapter 7 trustee could have collected the same amount of money as did the debtor, at less cost. The substantial administrative costs connected with the Disclosure Statement,

Plan, Examiner and numerous contentious hearings would have been avoided. The unsecured creditors would have received approximately twice as much money as they will now receive.

The principals of HCCI would have cooperated to the same extent regardless of whether this case were in Chapter 7 or had remained in Chapter 11. Claire G. Hutter was the spokesperson for all three debtors. She and her son Robert ("Rob") Hutter, were the sole two directors of HCCI. She signed the corporate resolution authorizing the filing of the petitions in bankruptcy. She was also the principal of HIC. For a number of months prior to the filing of the HCCI petition, MB & F represented Claire G. Hutter and HIC. Claire G. Hutter, or HIC, or both, directly benefited not only from the HCCI case, but from the AHC and THCC cases. Claire G. Hutter or HIC are, or were, personally liable to AIC for at least a portion of the debt of HCCI to AIC. Claire G. Hutter may have purchased the position of AIC ' shortly before this trial. As a result, AIC did not actively pursue its objection to the MB & F requests for compensation. The less MB & F gets paid, the greater the financial benefit to Claire G. Hutter and/or HIC, in a $1.00:80¢ ratio, with Claire G. Hutter and/or HIC saving 80 cents for every dollar MB & F doesn't receive of its fee requests, within certain limits. That is one reason HIC filed an objection to the MB & F fees. The operation of HCCI in Chapter 11 was intended to benefit Claire G. Hutter and/or HIC to the greatest extent possible. The same is true of the AHC and THCC cases.

A significant amount of the work in cleaning up the economic mess caused by the filing of the HCCI petition was performed by AIC and its counsel. AIC had great exposure to third parties, and it was in its best interest to complete the work in progress as quickly and as smoothly as possible. That would have happened whether the case was in Chapter 11 or in Chapter 7. That is not to say that MB & F did not make a substantial contribution to the HCCI case; it did, and that's why it's being compensated.

The Court, at a hearing on March 11, 1990, awarded MB & F interim fees in the sum of $83,157.00. The Court stated in its Minutes of March 16, 1990, a copy of which was mailed to MB & F, that "this award is subject to final review at the conclusion of the case, is subject to recoupment, and that the final review would be 'from scratch'." Any failure to object to a request for interim compensation did not constitute a waiver of rights to object at the conclusion of the case, when the final request for compensation would be made, for it is easier to value the services accurately at the conclusion of the case.

The Order confirming the Plan, dated July 20, 1990, stated in part that attorneys' fees, "if to be fixed after confirmation of the Plan, will be subject to the approval of the Court." The Court reserved the right to pass on fees.

The Disclosure Statement grossly underestimated the fees of MB & F. It estimated a dividend to unsecured creditors of 38%. (Exhibit 13, Exhibit E). The principal creditor, AIC, which held approximately 80% of the unsecured debt, realized, as the case progressed, that it would receive less than 38%. Unsecured creditors will probably receive no more than 18%–22% of their Allowed Claims, a significant decrease. Creditors must be kept informed about their anticipated recovery from a case when there is a significant change. When a debtor is insolvent, the owners of the debtor, in effect, are its creditors. (See Baird & Jackson, *Cases, Problems, and Materials on Bankruptcy*, Second Edition, Little, Brown and Co., 1990, Chapter 12.)

MB & F was too far off in estimating its fees. Exhibit 12, Debtors' Joint Disclosure Statement, Exhibit D, filed on Sept. 1, 1989, shows estimated fees of $84,933.02 pertaining to HCCI. Exhibit 13, Debtors' Amended Joint Disclosure Statement, Exhibit D, filed on Oct. 23, 1989, shows estimated fees of $95,000. Exhibit 14, giving figures up to Jan. 14, 1991, shows MB & F fees regarding HCCI at $154,184.27. Under the facts of this case, creditors should have been kept better advised on a current and on-going basis.

This court does not sanction the technique of two corporations, THCC and AHC, filing petitions in bankruptcy for the primary purpose of assisting another corporation already in bankruptcy. That strains limited available judicial resources. There was no benefit to creditors of AHC and/or THCC. The least MB & F should have done was to keep AHC and THCC out of bankruptcy as long as was possible, as filings may have been unnecessary. It is possible that the filings could have been avoided. Filing petitions in bankruptcy under those circumstances should have been the last option, not the first one.

Using a cost/benefit analysis, it is possible that MB & F was primarily responsible for bringing into this estate less than $1,000,000.00. (See Exhibit 14). Much of the balance of the assets either were available when the petition was filed or would have come into the estate in any event. There is much more to a bankruptcy case, however, than bringing assets into the estate. There are a myriad of problems which must be resolved in one forum. The benefits in this case to third parties were immeasurable. The real estate projects caught in this bankruptcy case amounted to uncounted tens of millions of dollars. The joint efforts of the principals of HCCI, MB & F, AIC and counsel for AIC brought order where there was chaos.

At the time of the trial, MB & F indicated that it was seeking compensation not only pursuant to its first four Applications for Compensation, but for services rendered since that time. Present at the trial were counsel for all of the parties who objected to compensation. One of the attorneys present represented AIC, which held 80% of all unsecured debt. There was no objection made by any person for the Court to proceed to determine those additional requests for compensation. Testimony on those additional requests was taken without objection, and Exhibits pertaining to those additional requests were received into evidence without objection. Nobody claimed to be prejudiced by any matter pertaining to fees being decided at the trial. Nobody requested an adjournment.

Everybody wanted all matters pertaining to fees to be determined by the court at the time of the trial. The court proceeded accordingly to hear and to determine all matters pertaining to compensation to be awarded to MB & F. *See* FED.R.CIV.P. 15(b).

### RECOGNIZED METHODS OF FEE COMPUTATION

There are at least seven recognized methods of computing attorneys' fees in bankruptcy court. The Bankruptcy Code gives no guidance as to any one method to use in computing fees, and decisions of other courts give little guidance. In the best of all possible worlds, it should make no meaningful difference which method is used; the outcome should be much the same.

One method of computing fees is the lodestar method. See *Lindy Bros. Builders v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973). The "lodestar" is the result obtained by multiplying an hourly rate by a number of hours. On occasion the "lodestar" is adjusted up or down, depending on the circumstances.

Another common method is the "multifactor" approach or "Johnson method." See *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). *Johnson* requires that twelve factors be applied in determining fees: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; [On occasion, such as in *Harman v. Levin*, 772 F.2d 1150, 1152, fn. 1 (4th Cir.1985), the following is substituted: the attorney's opportunity costs in pressing the instant litigation.]; (5) the customary fee; (6) whether the fee is fixed or contingent; [On occasion, such as in *Harman v. Levin, supra*, the following is substituted: the attorney's expectations at the outset of the litigation.]; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the

experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. The same twelve factors were endorsed in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983).

In some cases, the court combines more than one method. Although *Squillacote v. United States*, 626 F.Supp. 127, 130 (E.D. Wis.1985) (Reynolds, C.J.) was not a bankruptcy case, the decision is typical of results often reached in bankruptcy court. The court determined the fee by starting with the lodestar, and the fee was then adjusted using the *Johnson* factors.

The "equitable fund" method was explained in *In re Nucorp Energy, Inc.*, 764 F.2d 655, 661 (9th Cir.1985). Utilizing this method, fees and costs are awarded to an attorney for efforts in creating, preserving or protecting a fund or property for the benefit of a represented class. The fees are paid out of the funds, as, absent this form of compensation, the represented party would enjoy benefits without having shared the cost of acquiring the benefit.

It is also possible to use a "pure statutory method," by applying the literal language of 11 U.S.C. § 330 and making what amounts to a general subjective decision.

The "Penn–Dixie method" originated with *In re Penn–Dixie Industries, Inc.*, 18 B.R. 834, 838–39 (Bankr.S.D.N.Y.1982). Three main elements were applied: "(1) the quantity factor: documented time spent and customary billing rates; (2) the quality factor: the quality of advocacy required and delivered, taking into account the novelty and difficulty of the issues presented, skills called for, time constraints, and counsel's personal qualifications; (3) the result factor: the bottom line amount recovered for the estate and its creditors (as well as the degree of speed from loss to recovery)." By utilizing this method, the court is able to focus on a firm's baseline time charges, and, for cause, modestly enhance or sharply curtail them.

Some courts use what amounts to a basic "subjective method," which is a sophis-

ticated variation of the "Penn–Dixie method." This method is discussed in *In re Frontier Airlines, Inc.*, 74 B.R. 973 (Bankr.D.Colo.1987).

A variation of the basic "subjective method" is the "macroanalysis method." It was utilized in *First Bank Southeast, N.A. v. Predco, Inc.*, 744 F.Supp. 873 (E.D.Wis. 1990) (Warren, C.J.). Although this case was not a bankruptcy case, the discussion of fees was within a bankruptcy context. A copy of this Decision was furnished to all attorneys approximately three weeks prior to the commencement of this trial, as the *Predco* Decision had not been published at that time. The court ruled in effect, that "a microanalysis of the amount of time billed, the fee charged, the nature of the work, and the necessity of the work" was not necessary, and the court awarded what it believed were reasonable fees. This same approach appears to have been adopted in *In the Matter of Mira–Pak, Inc.*, 922 F.2d 214, 216 (5th Cir.1991).

## THE LAW

This court has jurisdiction of the pending dispute pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

■ Counsel for HCCI, prior to the trial, questioned the legal ability of the United States Trustee to pursue objections to compensation under the facts of this case. The United States Trustee has the legal right to file objections to compensation and to pursue those objections. Whether the United States Trustee should pursue objections to compensation in a relatively large case, such as this one, when all major parties were represented by legal counsel, is a matter to be decided by the Office of the United States Trustee, not by this court. A court has a duty to independently examine the reasonableness of fees, even if no objections are raised. *In re Oberreich*, 109 B.R. 936, 937 (Bankr.E.D. Wis.1990)

All fee requests begin with 11 U.S.C. §§ 328, 330 and 503, and Bankruptcy Rules 2014 and 2016. In general, counsel for a debtor in possession is entitled to "reason-able compensation for actual, necessary services rendered" ... "based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services ..." ... "and reimbursement for actual, necessary expenses." (11 U.S.C. § 330(a)(1) and (a)(2)). The attorney seeking compensation "shall file ... an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." (Bankruptcy Rule 2016(a)). The general concepts are simple; applying them to any given case is as much an art, based upon experience, common sense, and good judgment, as a precise science.

■ The burden of proof to show entitlement to requested fees is always on the applicant. *In re Oberreich*, 109 B.R. 936, 938 (Bankr.E.D.Wis.1990). For fees and expenses to be awarded as an expense of administration, "an applicant must meet its burden of persuading the court by a preponderance of the evidence that it rendered services that made a substantial contribution to the Chapter 11 reorganization." *In the Matter of Jack Winter Apparel, Inc., Winjak, Inc.*, 119 B.R. 629, 632 (E.D.Wis. 1990) (Curran, J.). "Although the burden of persuasion remains with the applicant, the burden of production shifts to the objector after the applicant has presented a prima facie case." *Id.* (Although the *Jack Winter Apparel, Inc.* case dealt with other issues, the cited quotes are equally applicable in this case.) The applicant must demonstrate that the services were actual, necessary and reasonable. *In re Grabill Corp.*, 110 B.R. 356, 358 (Bankr.N.D.Ill. 1990). The services must be beneficial to the bankruptcy estate. *In re Oberreich*, 109 B.R. at 938. "Among the factors to be considered in determining whether a substantial contribution has been made by the claimant are: whether the services were rendered solely to benefit the client or to benefit all parties to the case; whether the services provided direct, significant and demonstrable benefit to the estate; and, whether the services were duplicative of services rendered by attorneys for the com-

mittee, the committees themselves, or the debtor and its attorneys." *In the Matter of Jack Winter Apparel, Inc.*, 119 B.R. at 633. Courts often make a "tripartite analysis" in analyzing a fee application: "(1) Are the services which are the subject of the application properly compensable as legal services? (2) If so, were they necessary and is the performance of necessary tasks adequately documented? (3) If so, how will they be valued? Were the necessary tasks performed within a reasonable amount of time, and what is the reasonable value of that time?" *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 957–58 (9th Cir.1991). Professional fees are subject to court approval. An order approving employment of a professional is not an order approving compensation for the professional.

■ Even though three cases were administratively consolidated ("joint administration"), "[a]ny professionals appointed in more than one related case must keep separate time and expense records, and must make separate applications for employment and for compensation." *In re Parkway Calabasas Ltd.*, 89 B.R. 832, 836 (Bankr.C. D.Cal.1988). "The purpose of joint administration is to make case administration easier and less expensive than in separate cases, without affecting the substantive rights of creditors (including inter-debtor claims). There is no merging of assets and liabilities of the debtors ...". *Id.*

■ In reviewing fee requests, the court ordinarily must make a cost/benefit analysis. *In re Wildman*, 72 B.R. 700, 707 (Bankr.N.D.Ill.1987). A professional is not free "to run up a tab without considering the maximum probable recovery." *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.*, supra, 924 F.2d at 958. Professionals must consider: "(a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery? (b) To what extent will the estate suffer if the services are not rendered? (c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed

issues being resolved successfully?" *Id.* at 959; *Wildman*, 72 B.R. at 707.

It is disconcerting that attorneys are compelled, in order to justify their fees, to file fee applications with details which often run into the hundreds, or thousands, of pages. In the final analysis, that is not economically beneficial to anyone—not to the attorneys who spend so much time on fee applications, not to the court, if the court is expected to analyze them word by word, and, certainly, not to the parties, who ultimately end up paying (one way or another) for all that nonproductive work. Lengthy trials on fee applications should be avoided whenever possible, and all parties involved must take all reasonably possible action to avoid trials on such nonproductive matters.

Courts are split as to the ability of professionals to charge for time spent in preparing and defending fee applications. *In re Nucorp Energy, Inc.*, 764 F.2d 655 (9th Cir.1985) is cited most frequently for the proposition that such services are compensable. In *Nucorp Energy*, the application was wholly unopposed, with the exception of one motion. The HCCI case is dissimilar. Other courts have taken different positions regarding the ability of professionals to charge for their time pertaining to fee matters. *In re Wabash Valley Power Association, Inc.*, 69 B.R. 471, 478 (Bankr. S.D.Ind.1987) held that compensation was appropriate, but at a lower rate, because the services were of less benefit to the estate. Some courts allow no compensation, as was demonstrated in *In re Kroh Brothers Development Co.*, 105 B.R. 515 (Bankr.W.D.Mo.1989).

■ This Court agrees, in general, with *In re Nucorp Energy, Inc.*, supra, 764 F.2d at 662, that a reasonable amount of time spent in drafting fee applications is compensable. One way or another, clients end up paying. It is better that the charges be disclosed, so that people will know how much is being charged for that task. Courts can reduce requests for compensation for fee applications, particularly when the requests are unreasonable. *See Unsecured Creditors' Committee v. Puget*

*Sound Plywood, supra,* 924 F.2d at 961; *In the Matter of Mira–Pak, Inc., supra,* 922 F.2d at 216.

■ This Court also believes that attorneys are entitled to be compensated for the time spent in defending fee applications, if the attorneys are successful in the defense.

Courts must be just, before they are generous. *King v. Ionization International, Inc., et al.,* 825 F.2d 1180 (7th Cir. 1987). On the other hand, unwarranted parsimony of bankruptcy courts is not justice. It runs contrary to the philosophy of the Bankruptcy Code as expressed in § 330(a)(1), which requires that bankruptcy courts take into consideration "the cost of comparable services other than in a case under this title." Fortunately, the days of a bankruptcy court "being a court of economy," with resultant substantial fee cuts, have passed. Along with the passing of that concept came the return of some of the highest quality, most skilled attorneys to bankruptcy courts, to join the relatively few who braved the storm.

Baseless filings in bankruptcy court must be deterred, and the limited resources of the court should be spent on productive matters. *See Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* — U.S. —, 111 S.Ct. 922, 934, 112 L.Ed.2d 1140 (1991); also *see Metropolitan Life Insurance Co. v. Estate of Herbert Cammon,* 929 F.2d 1220, 1224 (7th Cir. 1991). This includes baseless fee applications, and irresponsible objections to fee applications. The same result can be, and periodically is, accomplished by a wholesale reduction in requested fees. See *In the Matter of Mira–Pak, Inc., supra,* 922 F.2d at 216. This is not a game we are playing. See *Kramer Heating & Manufacturing, Inc. v. United Bonding Ins. Co.,* 47 Wis.2d 191, 177 N.W.2d 119 (1970). Abuses must be curbed. *See Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., supra,* 111 S.Ct. at 928.

■ Courts must be reasonable and sensible when passing on fee requests. Attorneys must be compensated fairly and at reasonable intervals. Few courts can distinguish between a proper fee of $250,000

and $225,000. Much of what happens in a case takes place outside the courtroom, and judges have limited knowledge of those activities. Even the best attorneys have off days. The finest lawyers may be extraordinarily productive on some days, and not as productive on other days. There is no practical way a court can award fees based upon the productivity of lawyers on a day-by-day basis. Fly-specking is not productive.

■ A Chapter 11 case with substantial assets which will be distributed to creditors is not a "cash cow." One of the objectives in a Chapter 11 case is to distribute as much money to creditors as quickly as possible, particularly in view of the time value of money. Attorneys must use discretion as to the extent of legal services necessary. Cost/benefit analyses must be made at all times. That is not to say that attorneys must guaranty the outcome of their actions.

## FEE COMPUTATION USING THE LANGUAGE IN THE CONFIRMED PLAN

■ The procedure MB & F employed in seeking compensation from HCCI for services rendered in all three cases was to attempt to put an enabling provision in the Plan and to get the Plan confirmed. A confirmed plan is, in effect, a binding contract on the parties and determines their future rights and responsibilities. *See,* 11 U.S.C. § 1141(a) and its Legislative History. MB & F asserts that, if the Plan permits MB & F to get paid from HCCI for all services rendered to all three debtors, the Court is bound by the confirmed Plan, even though it is axiomatic that courts have supervisory authority over legal fees pertaining to pending actions.

The language of the Plan does not support the MB & F position. ¶ 4.4 of the Plan states, in part:

"The inter-relationship of the Debtors [HCCI, THCC and AHC] and their common interests in many issues in these bankruptcy proceedings makes the allocation of attorney time to the separate

bankruptcy estates an imprecise task at best. In view of the fact the Unsecured Creditors in THCC are expected to receive a distribution only if there is a successful recovery in the Pending Litigation and Other Litigation, and it is unlikely the Unsecured Creditors in Acqui will receive any distribution at all, *the fees of Michael, Best & Friedrich allocated to THCC and Acqui will be limited to the amount of retainages and cash on hand in the case of THCC, held for those entities by Michael, Best & Friedrich.* The balance of Michael, Best & Friedrich's *Allowed Claims* for costs and expenses of administration will be allocated to HCCI. This allocation has been made because of the significant benefit HCCI and its creditors has received in these proceedings resulting from the services performed by Debtors' counsel." (Emphasis added.)

[It came to the Court's attention, while drafting this Decision, that, on October 23, 1989, Michael, Best & Friedrich gave the Court a chamber's copy of the Debtors' Amended Joint Disclosure Statement Dated October 23, 1989, which differed from the other copy filed with the Clerk. There were differences in the wording of ¶ 4.4. The Court assumes that the Plan distributed to creditors was identical to the Plan given to the Court as a chamber's copy, as MB & F knows that the court works off its chamber's file, not the original file. The Court can only speculate as to why MB & F failed to file two identical copies of the Plan, particularly when ¶ 4.4 differed in the copies. Trial Exhibit 13, which included the Plan, differed from the chamber's copy, but was identical to the second "original" copy filed with the Clerk. The principal differences in ¶ 4.4 were in the first paragraph. The following language was omitted in the chamber's copy: (1) "and Other Litigation" (which words followed the words "Pending Litigation"); (2) "and cash on hand in the case of THCC" (which words followed the words "amount of retainages"); and (3) "and its creditors" (which words followed the words "significant benefit HCCI"). The omission of the indicated words on Exhibit 13 and on the first "origi-

nal" does not change the Court's opinion, which would be the same whether or not the words were in the Plan furnished to creditors. At the trial, the Court, on several occasions, read from ¶ 4.4 of the chamber's copy, the second "original," and the court assumes that MB & F, during the trial, noticed the difference in the versions of ¶ 4.4 while the court was reading from the chamber's copy.]

The plain language of ¶ 4.4 is clear: the MB & F fees allocated to THCC and Acqui are limited to the balance MB & F was holding in the retainers paid by THCC ($7,609.71) and Acqui ($7,938.35). MB & F received a $10,000 retainer from each debtor. The indicated sums are the balance of the retainers after MB & F properly applied against the retainers the outstanding bills for its prepetition services following the dismissal of the AHC and THCC cases. MB & F argued that ¶ 4.4 might not reflect its intent and, the major creditors knew that was not the intended result. The language of ¶ 4.4 is contrary to MB & F's argument. MB & F acknowledged that it could have attempted to modify the Plan. It did not do so.

MB & F also argued that, in ¶ 4.4 of the Plan, the sentences following the limitation of the MB & F fees in the AHC and THCC cases to the balance on hand of the retainers contradicts the previous sentences, and asserts that MB & F is entitled to charge all fees to HCCI and, indirectly, the HCCI unsecured creditors. The Court disagrees with that analysis. The sentence in ¶ 4.4 which follows the sentences previously referred to, refers to MB & F's "Allowed Claims." "Allowed Claims" is a defined term. It is defined in ¶ 1.3 of the Plan.

¶ 1.3 of the Plan provides, in part:

1.3 *Allowed Claim* means any Claim proof of which is filed on or before the date designated by the Court as the last date for filing proofs of claim ... and ... a Claim (a) as to which no objection to allowance has been filed within the applicable period of limitation fixed by the Code, The Bankruptcy Rules or an order of the court....

For a claim to be an "Allowed Claim," the claim, among other things, must be filed before the bar date for filing claims. The bar date for the filing of administrative claims was December 6, 1989. MB & F did timely file a claim for compensation in HCCI, specifically, Claim # 199, in the sum of $111,301.72. Nobody objected to that claim. It was deemed allowed. 11 U.S.C. §§ 501 and 502(a).

During the course of the trial, MB & F realized that it had a serious problem by not timely filing an Amended Claim. It responded immediately by filing an Amended Claim on April 18, 1991, in the sum of $298,447.05. (Exhibit 23). The April 18, 1991, claim was not filed within the time required by ¶ 1.3 of the Plan, specifically before the bar date. It also was not an Allowed Claim, as notice of the filing of the Amended Claim was not given to any person, nobody was given an opportunity to object to the Amended Claim, and one adversely affected person, Claire G. Hutter, who was sitting in the courtroom for much of the trial, raised an oral objection to the Amended Claim. That objection removed the Amended Claim from the definition of "Allowed Claim" as defined in ¶ 1.3 of the Plan.

MB & F's "Amended Claim" was not an amendment to an existing claim, in the usual manner of amending a claim. It was a new claim for an additional sum of money. Bankruptcy Judge Conrad B. Duberstein said:

Although bankruptcy law recognizes that a claim which amends a previously, properly filed claim may be allowed even though the amendment was effected after the statutory period has expired, the amendment is freely allowed only where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim. *In re Commonwealth Corp.*, 617 F.2d 415 (5th Cir.1980). The *Commonwealth* court held, however, that amendments subsequent to the time allowed for filing call for careful scrutiny in order to make sure that the amendment does not amount to an attempt to file an entirely new claim after the time for filing claims has expired. *In re Tesmetges*, 87 B.R. 263, 271–72 (Bankr.E.D.N.Y.1988).

MB & F has another problem with ¶ 4.4 of the Plan, specifically, its reference to the *balance* of MB & F's "Allowed Claims for costs and expenses of administration" being "allocated to HCCI." This sentence fails to state with any degree of certainty *which* "costs and expenses of administration" are to be allocated to HCCI. The logical interpretation of that sentence is that "balance" means "costs and expenses of administration" from debtors *other than* AHC or THCC. The word "balance", in the context used, means, in general, that which is left over. What is left over after AHC and THCC is HCCI. It does not include all the fees and expenses which were not paid by the THCC or AHC retainers plus all fees and expenses pertaining to HCCI. The THCC and AHC fees were specifically "limited to the amount of retainages [and cash on hand in the case of THCC] held for those entities" by MB & F. The words in brackets were among the words omitted by MB & F in one of the two copies of the Plan filed with the Clerk. It is axiomatic that a contract is interpreted against the party which drafted it. MB & F drafted the Plan.

Paragraph 4.4 of the Plan was inartfully drafted. Notwithstanding the language of ¶ 4.4, MB & F's interpretation, and any interpretation which the court might have given to it, MB & F knew that all of its fees were subject to Court approval. Its Application on behalf of HCCI to permit MB & F as counsel did not state that it intended to allocate all charges to HCCI. The Orders appointing MB & F did not give MB & F the right to allocate however it wished, or to charge HCCI for all legal services rendered to all three debtors. ¶ 4.4 of the Plan does not state that the Court does not retain jurisdiction, or the ability, to review the MB & F claim that it could load all legal fees onto HCCI. MB & F did not have a written retainer agreement. There was nothing in writing which

permitted MB & F to charge HCCI for the services rendered to another legal entity.

For each and every one of the reasons indicated, MB & F cannot rely on ¶ 4.4 of the Plan for support for its position. That is a good thing for MB & F; if that were not the case, MB & F's compensation would be limited to the amount of its Allowed Claim, $111,301.72, less $83,157.00 in interim compensation received pursuant to a March 16, 1990, order. MB & F is not entitled to compensation from HCCI for services rendered in the AHC and THCC cases.

## FEE COMPUTATION USING THE USUAL METHODS

MB & F knew that it had problems supporting its fee requests if it relied solely upon ¶ 4.4 of the Plan. For that reason, it also tied its fee request into all of the usual methods of computing compensation.

Utilizing the "lodestar" method, if MB & F is to be paid by HCCI for services rendered to all three debtors, the time spent in all three cases was excessive. MB & F acknowledged that the AHC and THCC cases were filed primarily, or in good part, to assist HCCI in getting its Plan confirmed. The services rendered by MB & F in the AHC and THCC cases were of nominal, if any, benefit to the HCCI creditors. They were of more benefit to the principals of HCCI and its related corporations, including THCC, AHC, HIC and a number of corporations which did not file petitions in bankruptcy. For example, Claire G. Hutter was sole shareholder of HIC. MB & F made no effort to bill any of the non-bankrupt corporations for its legal services, nor did it bill the principals of those corporations, even though they received direct benefit from the HCCI case. As a result, if MB & F were to be paid from the HCCI estate for services rendered in all three cases, the time spent by MB & F utilizing the "lodestar method" must be decreased substantially due to excessive time spent on fee matters, the time devoted to AHC and THC, and the failure of MB & F to keep accurate time records and/or to make an accurate allocation of time among the cases. As a general proposition, an attorney representing one client cannot bill another client for its legal services, unless there is a proper agreement permitting the billing to be made in that manner. There was no such approved agreement in these cases. The court is decreasing the allowable time using the lodestar approach by 40%. That diminishes the requested $282,119.14 to $169,271.48. The same is true of court costs and disbursements, as they also pertain to all three cases. The requested $16,327.91 must be decreased to $9796.75. On the other hand, if the fees and expenses of MB & F were limited to the services performed only in HCCI, the number of hours spent on HCCI would be reasonably close to a permissible amount. That cannot be established, however, by a review of time and expenses records, as there were none pertaining solely to HCCI. The only item which is clear pertaining to costs is that there were separate filing fees in each of the cases. The hourly rates of the MB & F attorneys were approved by stipulation, and the court will not change the rates charged. Utilizing the "lodestar" as best as possible, the court estimates reasonable compensation at $169,271.48 and reasonable expenses at $9796.75, in all, the sum of $179,068.23. The court chose not to award fees to MB & F based on the "lodestar method."

Utilizing the *Johnson* method, the court comes to the same conclusion, for the same reasons. A difficulty with the *Johnson* method is part of the eighth factor, "the results obtained." For the creditors of AHC and THCC, there were no results. They got nothing. There was nothing to give them. From the perspective of the AHC and THCC creditors, there was no point in those cases being in Chapter 11. MB & F is entitled to no compensation for services performed for AHC and/or THCC. As to HCCI, reasonable compensation, including all costs and expenses, would be $180,000.00. That includes, without limitation, the costs and expenses detailed on Trial Exhibit 2.

Using the *Squillacote* approach, which is a combined "lodestar" and "*Johnson* meth-

od," the result is the same for the reasons already stated. MB & F would be entitled to $180,000.00 for its fees and expenses.

Using the "equitable fund method," the assets which are available for unsecured creditors came generally from the HCCI case. MB & F isn't entitled to a portion of any funds of AHC or THCC, as there were none. As to the HCCI assets, a substantial amount of money was available to HCCI when the case was filed. Although MB & F definitely was instrumental in bringing assets into the estate, its efforts, utilizing the equitable fund theory, can be valued for all purposes at $167,000, which, when added to approximately $13,000 in expenses, again brings MB & F to the $180,-000 figure.

Using a "pure statutory method," that is, "reasonable compensation for actual, necessary services" rendered, plus "reimbursement for actual, necessary expenses," the court finds reasonable and necessary compensation to be $167,000 and actual and necessary expenses to be $13,000, in all, $180,000.00.

Using the "Penn–Dixie method," the most difficult obstacle for MB & F to overcome is the "result factor," the bottom line amount recovered for the estate and its creditors. There was no recovery for the creditors of AHC and THCC, and there should be no compensation in those cases. The result in HCCI for unsecured creditors would have been excellent had the unsecured creditors received the 38% estimated in the Disclosure Statement. The final recovery is likely to be 18%, with an outside chance of 22%. If the court had chosen to use this method, the court would award MB & F $165,000.00 in fees, and, as best as could be estimated, $13,000.00 in expenses. The Court chose not to use this method, since a microanalysis was made.

The Court did not utilize the basic "subjective method," due to its microanalysis. A subjective analysis was unnecessary. Had the Court made a subjective analysis, it is probable that the result would have been the same as the results utilizing the other methods. The Court may choose to utilize this method in most future cases, however, when a microanalysis is not required.

The Court did not utilize the macroanalysis approach utilized in *First Bank Southeast, N.A. v. Predco, Inc.*, for the same reasons the Court did not use the "basic subjective method." The Court may choose to use this method in future cases, however, when a detailed microanalysis is not required.

Regardless of which method the court applies, the final result is approximately the same.

## COURT ANALYSIS

Due to the unique facts of this case, the court is using another method in determining and awarding fees and expenses. There are four separate components in the request of MB & F for compensation: (1) fees for legal services pertaining to the three cases; (2) reimbursement for costs and disbursements in each of the three cases; (3) compensation for services performed pertaining to the drafting of fee applications; and (4) compensation for services, costs and disbursements pertaining to the necessity of MB & F defending its fee applications.

MB & F is seeking the total sum of $298,447.05. The $298,447.05 includes: (1) all legal services rendered in the HCCI case; (2) all out-of-pocket expenses in the HCCI case; (3) all legal services rendered in the AHC case; (4) all out-of-pocket expenses in the AHC case; (5) all legal services in the THCC case; and (6) all out-of-pocket legal expenses in the THCC case.

For the reasons previously stated, no fees, nor any reimbursement for expenses, are awarded in the THCC and/or AHC cases.

The largest factor, the legal fees to be awarded MB & F in matters not pertaining to the drafting of Fee Applications and in the defense of the Fee Applications, will be analyzed first.

Testimony at the trial indicated that the requested $298,447.05 pertains only to compensation and expenses as of April 19, 1991, and is generally broken down as follows:

$282,119.14    Total fees for all three cases
  16,327.91    Total expenses for all three cases

$298,447.05    Total fees and expenses requested

As shown in Exhibit 25 and by testimony at the trial, the $298,447.05 also includes:

$ 11,099.00    Fees related to fee applications in all three cases

31,921.00    Fees related to defense of fee applications-all cases

20,000.00    Additional fees estimated at the trial for the defense of fee applications

$ 63,020.00    Total fees related to fee matters in requested compensation

Utilizing those figures, the following is evident:

$282,119.14    MB & F's total fees in all three cases

– 63,020.00    Total fees related to fee matters in all three cases

$219,099.14    Total MB & F requested fees on non-fee matters in all three cases

| | | | |
|---|---|---|---|
| HCCI | $180,177.51 | 71.157% | (as computed by the court) |
| AHC | 31,942.01 | 12.615% | (as computed by the court) |
| THCC | 41,091.68 | 16.228% | (as computed by the court) |
| | $253,211.20 | 100.000% | |

The $253,211.20 represents the total MB & F charges for legal services in all three cases through the Fourth Fee Application. The $253,211.20 is substantially higher than the $219,099.14 calculated above. Why that is the case is not clear, except that the $253,211.20 contains an amount of expenses and disbursements in all three cases which cannot be broken out with any precision. Again giving MB & F the benefit of the doubt, the Court will award fees based upon the $253,211.20, rather than the $219,099.14.

Although the THCC charges were $41,091.68, MB & F credited against those charges the sum of $7,609.71, which was the sum it was holding as the balance of the unused $10,000.00 prepetition retainer in that case. In a similar manner, the AHC fees were $31,942.01. MB & F credited against the $31,942.01 the sum of $7938.35, which was the sum it was holding as the balance of the unused $10,000.00 prepeti-

It would be inequitable to totally deny MB & F compensation because it failed to itemize and allocate fees and expenses accurately, as required. MB & F performed valuable services. When MB & F reluctantly allocated fees among the debtors, after being urged by the Court to do so earlier in the case, MB & F arrived at the following allocation, as shown in Exhibit 2. The Court is using the allocation through the Fourth Fee Application shown on Exhibit 2. The court realizes that will result in MB & F receiving more compensation than it otherwise would receive, as, starting near the end of the Fourth Fee Application, substantially all of its charges pertain only to its defense of its Fee Applications.

tion retainer in that case. Those applications were proper.

■ The Court is using the same allocation chosen by MB & F, even though the MB & F allocation was weighted in its favor by charging as much to HCCI as it believed was reasonable and proper. The court will not nitpick. The mathematics is: 71.157% × $253,211.20 = $180,177.51. The court is awarding MB & F that sum, $180,177.51, as its compensation in the HCCI case.

The second component consists in the MB & F out-of-pocket expenses and disbursements. For the same reason no fees for legal services are awarded in the AHC and THCC cases to be paid from the HCCI estate, the court is not awarding MB & F payment from the HCCI estate for its out-of-pocket expenses and disbursements. According to Exhibit 2, all costs and expenses in all three cases totalled $14,572.15

through the Fourth Fee Application. A portion of the out-of-pocket expenses in the Fourth Fee Application, and all out-of-pocket expenses after the Fourth Fee Application, dealt only with the defense of the MB & F Fee Applications. MB & F does not appear to be able to ascertain how much was spent in each case. The Court, following a review of the files in all three cases, is allocating 71.157% of that sum to HCCI, specifically, $10,369.11. MB & F is awarded the $10,369.11.

■ The third component pertains to fees relating to the MB & F fee applications. The MB & F charges pertaining to drafting its Fee Applications is detailed on Exhibit 25. All charges related to all Fee Applications through the Fourth Application totalled $10,267.50. Although there were additional charges of $831.50 for fees related to applications, the $831.50 pertained to three additional invoices which dealt with MB & F's defense of its Fee Applications. According to Exhibit 8, MB & F spent 94.1 hours on the preparation of its four Fee Applications. The Court reviewed those fee applications in detail. It should not have taken MB & F so long to draft those fee applications. There were only 46 substantive pages in all four Fee Applications combined. Many of the paragraphs in the Fee Applications were almost identical. Although there are hundreds and hundreds of pages of attachments, the information on the attachments generally consisted of information on time sheets and expense statements. That compilation could have been done in a limited number of hours by a skilled secretary or a paralegal. The 94.1 hours is excessive, and the requested $10,267.50 is being decreased by one-third, to $6845.00. For this third component, MB & F is awarded the $6845.00. The remaining $831.50 on Exhibit 25, which pertains to the three additional invoices, is being moved to the fourth component, as it pertains entirely to services performed during the defense of the MB & F fees.

■ The final component pertains to compensation for services, costs and disbursements pertaining to the necessity of MB & F defending its fee applications. It is appropriate to determine how close MB & F and the United States Trustee were to the fee award of the court. The court will award MB & F the proportional amount. In other words, if MB & F received exactly what it requested, it would receive 100% of all charges pertaining to the defense of its fee applications. If MB & F received nothing above which the United States Trustee was willing to concede, MB & F would receive no compensation pertaining to the defense of its Fee Applications and subsequent charges. This method was also suggested by MB & F at the conclusion of the trial. There was merit to the requests of MB & F for fees and compensation, and there was merit to the objections by the United States Trustee. To deny MB & F any compensation for its services rendered in defending its requests would be unjust, especially since MB & F has been awarded a reasonable amount of the compensation it sought, notwithstanding the objections.

The United States Trustee ultimately indicated that he had no objection to MB & F compensation for services in the sum of $156,000.00, to be paid from the HCCI estate. (Brief of the United States Trustee in support of his objection to compensation.) Although the United States Trustee did not, at least to the knowledge of the Court, agree to $156,000.00 in compensation prior to that time, there is no question but that MB & F would not have accepted that sum in full payment of its services at the time the battles on the MB & F compensation began.

At the time, MB & F was requesting $238,911.14 in compensation for services rendered through its Fourth Fee Application. Exhibit 2. ($131,614.00 + 29,846.50 + 54,543.57 + 22,907.07 = $238,911.14). The United States Trustee would allow $156,000.00. The parties were $82,911.14 apart. The United States Trustee was considerably closer to the figure determined by the court; he was $24,177.51 off. ($180,177.51 − $156,000.00 = $24,177.51). MB & F was off by $58,733.63 ($238,911.14 − 180,177.51 = $58,733.63). Using these figures, $24,177.53 ÷ $82,911.14 = 29.16%. On the other hand, $58,733.63 ÷ $82,911.14

= 70.84%. If this approach is used, MB & F would be entitled to 29.16% of $82,911.14 (the sum in dispute), which is $24,176.89, for its services pertaining to defending its Fee Applications.

The Court realizes that the $24,176.89 is more than MB & F would receive if the same percentage, 29.16%, is taken of the fees related to defense of fee requests detailed on Exhibit 25, which is $52,752.50. The $52,752.50 was determined by adding $31,921.00 (on Exhibit 25) + $20,000 (the MB & F-estimated additional figure given at the trial) and $831.50 (carried over from the fees related to preparation of the applications, for the reasons previously indicated in this Decision).

There is a difficulty in awarding MB & F the $24,176.89 for the fourth component. The United States Trustee's Objection to Applications for Compensation did not specifically object to reimbursement of expenses, only to "compensation." It was not clear if "compensation" was intended to pertain also to reimbursement of expenses. If it did, other figures would be applicable, and the difference between this calculation and the previous calculation is significant, because the percentages are different, a greater sum of money is involved, and the difference is larger. In that instance, the United States Trustee would have approved $156,000.00 and, undoubtedly, the $10,369.11 awarded by the Court for expenses, in all, $166,369.11. MB & F was seeking $253,483.20 in fees and expenses through its Fourth Fee Application. (Exhibit 2). The difference between MB & F and the UST would then have been $87,114.09. ($253,483.20 − 166,369.11 = $87,114.09). Using this method of calculation, the court awarded $197,391.62 for the first three components. ($180,177.51 fees + $10,369.11 expenses + 6845.00 preparation of applications = $197,391.62). The United States Trustee was $31,022.50 off. MB & F was $56,091.57 off. Utilizing these figures for the United States Trustee, $31,022.51 ÷ $87,114.09 = 35.61%. Utilizing these figures for MB & F, $56,091.57 ÷ $87,114.09 = 64.39%. The percentage to be used in calculating the sum to which MB & F is

entitled to for litigating its Fee Applications varies depending on whether or not the out-of-pocket costs and Fee Applications' figures are inserted, specifically, 29.16%, if only compensation were challenged, and 35.61%, if items other than compensation were challenged. The dollars involved are larger in the latter instance, as well. In the first approach, assuming no challenge to expenses by the United States Trustee, the result is: 29.16% × $82,911.14 = $24,176.89. That means that MB & F would be entitled to $24,176.89 as the fourth component. If the second method of calculation is applied, that is, if the Court assumes that the United States Trustee challenged MB & F's request for out-of-pocket costs and disbursements, as well as its fees for legal services, the result would be: 35.61% × $87,114.09 = $31,021.34. That means that MB & F would be entitled to $31,021.34 as the fourth component. The pleadings, including the Objection of the United States Trustee, however, are not clear. Although there is no specific language in the Objection by the United States Trustee, an objection to reimbursement of out-of-pocket expenses could conceivably be read into the Objection. The Court believes that one analysis is as logical and possible as the other. As a result, the court will take the average of the two methods: $24,176.89 + $31,021.34 = $55,198.23, which ÷ 2 = $27,599.12. MB & F is entitled to $27,599.12 for all of its services pertaining to the defense of its fee applications.

## CONCLUSION

To summarize, MB & F is awarded the following:

1. Fees for legal services: $180,177.51;

2. Reimbursement for costs and disbursements: $10,369.11;

3. Compensation for services performed pertaining to the drafting of fee applications: $6845.00;

4. Compensation for services, costs and disbursements pertaining to the necessity of MB & F defending its fee applications: $27,599.12.

The total is $224,990.74. MB & F is entitled to total payment in the sum of $224,990.74. MB & F may apply against that sum the balance of the HCCI retainer it is holding, which, according to Exhibit 2, is $6,105.37. HCCI shall also be credited with the $83,157.00 interim fee allowance.

## DIRECTIVES FOR FUTURE CASES

■ A detailed, microanalysis by the Court should not be necessary in any but the rarest circumstances. Such circumstances did not exist in this case. For most cases, in the event no objection to compensation is raised, the court will utilize the *"Squillacote* method", that is, the "lodestar method" plus a review of the *Johnson* factors. The *"Penn–Dixie* method" also may be adequate as an alternative. Microanalysis will be the rare exception and used only in the event of serious objections. Nitpicking, invariably, is not productive.

■ In all cases, fee applications must contain true specificity. Broad, general statements are not adequate. All fee applications in Chapter 11 cases must be broken down by category of services performed. When requests pertain to jointly administered cases, there must be detailed allocations.

■ All objections in all cases must contain equal specificity. Blanket or general objections will not be permitted. If there is an objection by category, the objection must be specified, with detailed reasons. If an objection is filed to a category, the objection will be deemed to apply to the entire category, unless stated otherwise. When an objection to compensation is filed, it is expected that the person(s) seeking compensation will meet promptly with the person(s) objecting to the compensation, and that they will make a good faith attempt to work out their differences in an amicable manner.

Failure of any counsel or professional to comply will result in appropriate action by the Court. In the vast majority of cases, the Court will make a modified macroanalysis, following *Squillacote*, without a microanalysis. If and when the parties require a microanalysis, the Court will proceed subject to the caveats and methods stated in this Decision. Regardless of the method utilized, the Court will take into consideration the cost/benefit relationship of all legal services. If the cost/benefit analysis reflects that the cost was disproportionate to the benefit, the reasons must be explained in the application for compensation.

When all is said and done, there is only one Rule for professionals: Be honest. That means: be fair; don't overlawyer a case; charge a reasonable fee; keep an eye on the cost/benefit analysis; and act in accordance with the *highest* moral and ethical standards of the legal profession and general civility. It is a fact, for better or for worse, that, due to crowded calendars, courts must rely upon the integrity and reputation of attorneys. That trust must not be misplaced.

This Decision includes, and constitutes, the Findings of Fact and Conclusions of Law in accordance with the Federal Rules of Civil Procedure and the Bankruptcy Rules.

This Decision is in conformity with an oral Decision read into the record shortly after the conclusion of the trial.

An Order consistent with this Decision will be signed and entered immediately.