**In re GILLETT HOLDINGS, INC., Employer Tax I.D. 51–0291762, Debtor.**

**Bankruptcy No. 91–12465–SBB.**

United States Bankruptcy Court, D. Colorado.

Feb. 5, 1992.

Douglas M. Tisdale, Louise Romero–Atwood, Brownstein Hyatt Farber & Madden, Lewis S. Rosenbloom, Winston & Strawn, Special Counsel, for debtor.

Mark Polebaum, Hale and Dorr, Mark Fulford, Sherman & Howard, Local Counsel for petitioning Creditors.

James Burkhardt, Moye Giles O'Keefe Vermeire & Gorrell, for Official Creditors' Committee.

Leslie Berg, for U.S. Trustee.

Edwin G. Perlmutter, Berenbaum & Weinshienk, P.C., for Executive Life Ins.

Virginia Grogan, Latham & Watkins, for Smith Barney, Harris Upham & Co., Inc.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court upon the First Quarterly Application of Latham and Watkins ("L & W") for Interim Allowance of Compensation and Reimbursement of Expenses as Counsel to Smith Barney, Harris Upham & Co., Financial Advisor for Gillett Holdings, filed October 31, 1991 (the "Application") and Objections thereto filed by the Official Creditors' Committee on November 26, 1991 and the United States Trustee on November 27, 1991. Following a hearing on the matter, and at the suggestion of this Court, L & W filed a Supplement to First Quarterly Application of Latham & Watkins for Interim Allowance of Compensation and Reimbursement of Expenses as Counsel to Smith Barney, Harris Upham & Co., Financial Advisor for Gillett Holdings, Inc. on December 12, 1991 (the "Supplemental Application"). The Court, having reviewed the file and being sufficiently advised in the premises, makes the following findings of fact and conclusions of law.

## I. BACKGROUND.

This case was commenced on February 27, 1991 by the filing of an Involuntary Petition for relief pursuant to Chapter 11 of the Bankruptcy Code. Following time extensions, the Debtor[1] consented to the entry of an Order for Relief on June 25, 1991, and has continued as a Debtor-in-Possession since that time.

Employment of L & W, as counsel for Smith Barney, Harris Upham & Co. ("Smith Barney"), was authorized by this Court's Order dated August 29, 1991, *nunc pro tunc* February 27, 1991 which provided, in part, that "Smith Barney is autho-

---

1. The Debtor is a multi-level holding company with over 50 subsidiaries, affiliates and related entities, primarily in the resort, meatpacking and media industries.

rized to retain the law firm of Latham & Watkins as Smith Barney's counsel, effective as of June 11, 1991, for the limited purpose of advising Smith Barney in connection with the application for Smith Barney's retention and matters pertinent thereto, including, *inter alia,* retention proceedings through the date of this Order and fee applications and other filings that Smith Barney may be required to make with this Court, and that all the fees and expenses of Latham & Watkins are subject to the Compensation Order." [2]

The instant Application (as slightly amended by the Supplemental Application) requests reimbursement of $4,105.02 in expenses and approval of $43,888.25 in fees calculated as follows:

| TIME PERIOD | FEES | EXPENSES |
|---|---|---|
| 06/11/91-07/31/91 | $39,071.25 | $3,378.25 |
| 08/01/91-08/31/91 | 5,592.50 | 1,042.26 |
| 09/01/91-09/31/91 | 490.50 | 208.89 |
| Subtotal | $45,154.25 | $4,629.40 |
| Less: Initial "Adjustments"[3] | -783.75 | -524.38 |
| Less: Subsequent "Adjustments"[4] | -482.25 | -0.00 |
| Total | $43,888.25 | $4,105.02 |

## II. GENERAL CONSIDERATIONS.

*Principles Governing Fee Applications.* Section 330 of the Bankruptcy Code governs compensation of professionals in the bankruptcy context. That section provides, in essence, that a court may award to professionals,

[R]easonable compensation for actual, necessary services ... based on the nature, the extent, and the value of such services, the time spent on such services and the cost of comparable services other than in a case under this title.

11 U.S.C. § 330.

In order to determine the appropriate compensation, Rule 2016, Fed.R.Bankr.P., requires that,

A person seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file with the court an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested.

Rule 2016, Fed.R.Bankr.P.

**2.** The Compensation Order referred to herein is the September 5, 1991 Amended Order Establishing Interim Fee and Expense Reimbursement Application Procedure which set forth procedures and guidelines to be followed by all parties seeking either compensation or reimbursement from assets of the instant estate.

**3.** Footnote one to the Application explains these "Adjustments" as follows:

As a result of a self-audit, the amount of fees has been reduced by $783.75 to reflect the elimination of an incorrect entry of time for Ms. Grogan on August 29, 1991. In addition, the amount of expenses has been reduced by $524.38 (which includes a reduction of telecopying charges by $328.50, a reduction of pho-

tocopying charges by $61.68 and a reduction of legal research expenses by $134.20) in order to bring such charges in line with the Compensation Order, which was not in place before most of such charges were incurred and logged.

**4.** The Supplemental Application explains these voluntary "Adjustments" as follows:

2. The time entry for Ms. Grogan for 8/12/91 should be changed to reflect .4 of an hour rather than 2.05. This will result in a reduction of $470.25 ($285 × 1.65) from the bill.

3. The time entry for Ms. Yanosey for 8/21/91 will be removed from the bill, resulting in a further reduction of $12.00.

■ The burden of proving the value of the services for which compensation is sought is always on the applicant. *See, generally, In re Pettibone Corp.,* 74 B.R. 293, 299 (Bankr.N.D.Ill.1987). "This burden is not to be taken lightly, as 'every dollar expended on [professional] fees results in a dollar less that is available for distribution to the creditors.' " *In re Chicago Lutheran Hospital Ass'n,* 89 B.R. 719, 732 (Bankr.N.D.Ill.1988) (quoting *In re Hotel Associates, Inc.,* 15 B.R. 487, 488 (Bankr.E.D.Pa.1981)).

■ The primary objective of any fee application is "to provide sufficient data to enable the court to determine whether the services rendered were reasonable, actual, and necessary." *In re Wire Cloth Products, Inc.,* 130 B.R. 798, 806 (Bankr.N.D.Ill. 1991). This objective will only be satisfied if the court can, from the application and accompanying documentation itself, pass on all aspects contained therein.[5] *Accord, Chicago Lutheran Hospital, supra* at 735 ("In all fee requests, the fee application is inevitably the starting point for analysis. It is the crucial document in any fee matter.").

■ Taking a fee application as submitted, this Court has the affirmative duty to examine and challenge requested fees, even in the absence of objection. *Accord, In re Taxman Clothing Co., Inc.,* 134 B.R.

286 (N.D.Ill.1991) (stating that it might even be an abuse of discretion to fail to challenge an insufficient fee application). *See, generally, In re Gold Seal Products Co., Inc.,* 128 B.R. 822, 827 n. 3 (Bankr. N.D.Ala.1991) (cases cited). *Accord, In re Concept Clubs, Inc.,* 125 B.R. 634, 636 (Bankr.D.Utah 1991) ("The supervision of professional fees is essential to the operation of the bankruptcy law, integral to the bankruptcy system and required by the Bankruptcy Code.").[6]

■ Court must determine (1) if the Application itself provides adequate detailed information required for meaningful review, and (2) given adequate information, if the services performed and expenses incurred were actual and necessary, of benefit to the estate, and resulting in a reasonable fee. "If there is a failure of proof in either inquiry, the court cannot approve payment of the affected claim from resources of the bankruptcy estate." *Gold Seal Products, supra* at 828.

The Tenth Circuit has established a framework, or checklist, of considerations in awarding fees. *Matter of Permian Anchor Services, Inc.,* 649 F.2d 763 (10th Cir. 1981) (adopting the standards set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974)).[7] That framework is to be applied to fees in a bankruptcy case. *In re Grayhall Re-*

---

**5.** Some courts have even gone so far as to state that "[n]ecessary information must be in the fee application itself and should not require an evidentiary hearing. There is authority for the proposition that the fee [application] hearing should not be used as a time to explain the entries on the application." *In re Busy Beaver Building Centers, Inc.,* 133 B.R. 753 (Bankr. W.D.Pa.1991). *Accord, In re Chas. A. Stevens & Co.,* 105 B.R. 866, 870 (Bankr.N.D.Ill.1989) ("fee applications must stand or fall on their own merits.").

**6.** Even though private compensation agreements are permitted under the Bankruptcy Code, this Court "retains the responsibility of ensuring that the compensation awarded to professional persons falls within the parameters prescribed by section 330." *Chas. A. Stevens, supra* at 870. *Accord,* House Rep. No. 95–595, 95th Cong., 2d Sess. 40, 1978 U.S.Code Cong. & Admin.News 5787, 5826 ("In a bankruptcy case fees are not a matter for private agreement.

There is an inherent public interest that must be considered in awarding fees ... compensation in private employment ... is a point of reference not a controlling determination of what shall be allowed in bankruptcy cases.").

**7.** In awarding fees in bankruptcy matters, the court should appropriately consider the following factors: (1) the time and labor required; (2) the novelty and difficulty of the issues presented; (3) the skill required to perform the services properly; (4) the preclusion of other employment due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the professionals; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*sources, Inc.*, 1990 WL 314011 (Bankr. D.Colo.1990) (not reported in B.R.).

■ The U.S. Supreme Court has since affirmed the principle that, in awarding fees, a court should start with the "lodestar" method, which is established by applying a reasonable hourly rate to the reasonable number of hours required for the task. *Blanchard v. Bergeron*, 489 U.S. 87, 87–88, 109 S.Ct. 939, 941, 103 L.Ed.2d 67 (1989). Thus, the starting point, or the centerpiece, for determination of reasonable fees is to apply a reasonable hourly rate to a reasonable number of hours which should have been required to achieve the necessary results and then full consideration must be given to the factors enumerated in *Permian Anchor Services. Id.*

In evaluating the reasonable number of hours required for the task, the Tenth Circuit has observed that the *actual* time expended is not necessarily the *reasonable* time expended. In the private sector, so-called "billing judgment" is an important component in fee setting which is no less important when the fees are to be approved by the Court. *Smith v. Freeman*, 921 F.2d 1120, 1122 (10th Cir.1990); *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir.1983). *See also, Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939–1940, 76 L.Ed.2d 40 (1983) (professionals, in applying for fees "should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.").

■ Any calculation of reasonable fees, based on services rendered and hours expended, must be leavened with an assessment of benefit accruing to the estate. *Accord, e.g., In re Grabill Corp.*, 110 B.R. 356, 358–359 (Bankr.N.D.Ill.1990). Many hours recorded resulting in no benefit can result in reduced fees and may result in no fees. Billable hours are not necessarily compensable hours. "An increasing attitude in the bankruptcy community is that if the time is actually expended, the applicant is entitled to receive all fees requested. All professionals must be disabused of this fallacious notion." *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 871 (Bankr.N.D.Ill. 1989). "In other words, a debtor's estate should not bear the costs of services which were either excessive or duplicative of the efforts of other professionals." *Wire Cloth Products, supra* at 806.

■ In the final analysis, the setting of fees, whether by this Court or by the professionals themselves, is an art, not a science. *Accord, In re Frontier Airlines, Inc.*, 74 B.R. 973, 979 (Bankr.D.Colo.1987). The fee awarded must ultimately be "a 'reasonable' fee—not the exact fee, not the right fee, but a reasonable fee. 'Reasonableness' is a most subjective standard with a range of acceptability." *Grayhall Resources, supra.*

■ "Few rulings in a bankruptcy case generate more outrage from the public, anxiety among attorneys, and tribulation for judges than the compensation of officers of an estate" pursuant to Section 330. *In re CF & I Fabricators of Utah, Inc.*, 131 B.R. 474, 480 (Bankr.D.Utah 1991). *Accord, In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 15 (Bankr. S.D.N.Y.1991) ("The review of professional fees ... is distasteful to the Court and demeaning to the professional. Unfortunately, however, it is mandated by the Bankruptcy Code."). In view of the fact that the burden of proof as to the entitlement to fees lies on the applicant/professional, however, this Court is not required to "indulge in guesswork," or "undertake extensive labor to justify a fee for an [applicant] who has not done so himself." *In re Horn & Hardart Baking Co.*, 30 B.R. 938, 944 (Bankr.E.D.Pa.1983). "It is not overly burdensome to require that a person seeking compensation from the bankruptcy estate adequately explain the time for which compensation is sought." *Chicago Lutheran Hospital, supra* at 735–736.

### III. FEES REQUESTED.

Although not expressly stated in either the Application or the Supplemental Application, the Court has determined that L & W has billed the following hourly rates for

the services performed on behalf of Smith Barney in this case:

| PROFESSIONAL | POSITION | HOURLY RATE |
|---|---|---|
| Bassett | "partner" | $350.00 |
| Lurey | "partner" | 350.00 |
| Grogan | "partner" | 285.00 |
| Edwards | "partner" | 270.00 |
| Godshall | "partner" | 270.00 |
| Hall | "associate" | 195.00 |
| Fuentes-Garcia | "librarian" | 85.00 |
| Stephens | "librarian" | 65.00 |

This Court has not been supplied with information regarding the level of education, the extent of experience, professional standing, or the area of expertise of each individual professional, other than the titles as stated above. Such information is not a mere courtesy or aid to the Court in fee applications ... it is invaluable. In the absence of such information, this Court is disadvantaged in that it cannot, as it must, properly assess either (1) the propriety of the hourly billing rates [8]; or (2) the propriety of task allocation.

This Court, to the extent that the time entries clearly indicate, has broken the recorded time into the following categories:

**8.** The Tenth Circuit has recently noted in the bankruptcy context: "As a general comment, we observe that $150 is a more than generous hourly fee." *Smith v. Freeman*, 921 F.2d 1120, 1122 (10th Cir.1990). While this *dicta* is certainly not controlling in this case, it is rather interesting when dealing with billing rates of $350.00 per hour, as here.

| CATEGORY | | HOURS | PERCENTAGE |
|---|---|---|---|
| Coordinate efforts re: initial employment agreement: | | | |
| Review, revise, draft | 9.95 | | |
| Telephone calls, meetings | 12.40 | 22.35 | 11.86 |
| Prepare memorandum: | | | |
| Research, draft, review: | | | |
| Hall | 99.0 | | |
| Others | 9.10 | | |
| Telephone calls, meetings | 2.65 | 110.75 | 58.78 |
| Prepare for and attend hearing: | | | |
| Preparation | 13.6 | | |
| Travel | 8.75 | | |
| Hearing | 3.5 | | |
| Telephone calls, meetings | 7.15 | 33.0 | 17.52 |
| Revise employment agreement (post-hearing): | | | |
| Draft, revise, review | 8.35 | | |
| Telephone calls, meetings | 9.75 | | |
| Letters | 1.5 | | |
| Copy and distribute | 0.2 | 19.8 | 10.51 |
| Issues related to L&W's retention: | | | |
| Review, revise | 2.2 | | |
| Letter | 0.3 | 2.5 | 1.33 |
| Totals | | 188.40 | 100.00 |

At the outset, it must be noted that virtually all of L & W's time and legal services are related to employment of its client, Smith Barney, by the Debtor. In effect, L & W requests about $45,000.00 in fees and

expenses for its services on Smith Barney's employment contract.

█ Clearly, the greatest number of hours was spent by L & W in preparing a Memorandum of Law in Support of the Debtor's Application for Authority to Employ Smith Barney, Harris Upham & Co., Inc. (the "Memorandum"). During the three-week period from June 28, 1991 to July 19, 1991, when the Memorandum was filed, over 110 hours, over $20,000.00 of fees, or almost 59% of the time, was billed. The Memorandum, while helpful in providing background regarding Smith Barney's relationship and connection with the Debtor, was hardly research-intensive or a magnum opus on arcane aspects of bankruptcy law. It was a competent piece of work on a straightforward issue. No new legal ground was broken by the discussion in the Memorandum of either (1) the generally-accepted principle of professionals being paid on a periodic schedule in large cases [9]; (2) non-bankruptcy compensation [10]; or (3) the *Permian Anchor* elements.[11] Indeed, it could be successfully argued that the Memorandum presented, primarily, traditional, somewhat worn, arguments previously rejected by some other courts and, to a degree, contrary to the trend in current case law respecting employment and payment of compensation to investment bankers in a Chapter 11 case.

The U.S. Trustee, in its Objection, alleges that the Memorandum dealt primarily with the issue of indemnification. In fact, however, only one paragraph actually dealt with indemnification and that paragraph cited no case law.[12]

The amount of time expended to produce the Memorandum which consists of approximately 20 pages, and which fails to fully address certain of the more important issues relating to the propriety of Smith Barney's employment, is, in this Court's opinion, grossly excessive.[13] But for this exercise, L & W's time expended would be relatively modest. This Court believes that thirty (30) hours of Mr. Hall's time would have been more than sufficient to produce a product such as the Memorandum. This view is reinforced, in part, by L & W's own characterization of the L & W firm as experienced and skilled in Chapter 11 cases and employment issues very similar to those involved here with Smith Barney. Accordingly, this Court will allow $5,850.00 (30 hours × $195.00 per hour, Mr. Hall's hourly rate) and will disallow the remaining $16,765.75 in fees associated with producing the Memorandum.[14]

█ In addition to making this fee reduction on the Memorandum, this Court believes that it must partially account for several other problems that it notes with regard to fees in the instant Application. This Court, for example, agrees with and expressly here adopts, the U.S. Trustee's comments regarding inadequate detail in work descriptions, improper task allocation,

**9.** *See, e.g., In re Frontier Airlines, Inc.,* 74 B.R. 973 (Bankr.D.Colo.1987) and *In re Kaiser Steel Corp.,* 74 B.R. 885 (Bankr.D.Colo.1987).

**10.** *See,* 11 U.S.C. § 330 (In evaluating the reasonableness of a professional fee, one factor a court should consider is "the cost of comparable services other than in a case under [Title 11].").

**11.** *In re Permian Anchor Services, Inc.,* 649 F.2d 763 (10th Cir.1981) adopting the factors previously set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).

**12.** *See,* Memorandum at p. 7, where it is argued that "it would be *unfair,* after the negotiation, to require Smith Barney to abandon this customary—but critical—part of its arrangement with [the Debtor]" (emphasis added) and four unreported decisions are listed that allegedly allowed Smith Barney to utilize a "gross negligence carveout" provision in an indemnification arrangement. *See, generally, In re Mortgage & Realty Trust,* 123 B.R. 626, 630 (Bankr.C.D.Cal. 1991) (giving "very little weight" as precedent to unreported bankruptcy court decisions).

**13.** Contrary to L & W's assertion in the Supplemental Application, "Because of our experience in other cases, we were able to prepare and file a what we believe was a first-rate brief for a minimum expenditure of hours. We believe that anyone who has read the brief will agree that the time spent on the brief was necessary and not excessive."

**14.** Total fees incurred in producing the Memorandum were $22,615.75 (Lurey, 1.5 hours × $350 = $525; Grogan, 7.8 hours × $285 = $2,223; Edwards, 1.5 hours × $270 = $405; Hall, 99.7 hours × $195 = $19,441.50; Fuentes-Garcia, 0.25 hour × $85 = $21.25).

and "lumping" of time [15] in certain time entries. Further, the Court is unable to discern any actual or useful "billing judgment" exercised by L & W in its billing practices or fee Application.

Finally, the Court must weigh, at least to some degree, the benefit derived by the Debtor and/or Smith Barney from the legal services of L & W to be paid by the estate. Recognizing that there is a unique (some would say questionable) relationship here, where the attorneys, L & W, for the Debtor's investment banker, Smith Barney, are being paid by the Debtor and not by its client, the investment banker, still there should be identified some benefit inuring to the Debtor, to Smith Barney, or to the reorganization process, before fees, to be paid by the estate, are approved by the Court.

The Court can here discern very little benefit flowing to the estate or reorganization process from the services of L & W; it can discern only modest benefit flowing to Smith Barney.[16]

The Court will, for the several different reasons cited above, discount the remaining L & W fees requested ($21,272.50), and to be paid by the estate, by one-half (50%). Therefore, the Court will approve payment of fees, in addition to the $5,850.00 directly attributed to the Memorandum, in the amount of $10,636.25.[17]

## IV. EXPENSES.

The applicant also carries the burden of establishing that it is entitled to the reimbursement of expenses. "The Court will not assume any expense is necessary.... An expense is necessary if it was included because it was reasonably needed to accomplish the proper representation of the client." *In re Convent Guardian Corp.,* 103 B.R. 937, 939 (Bankr.N.D.Ill.1989) (cases cited). L & W requests that this Court authorize reimbursement of the following expenses:

---

**15.** *See, e.g., In re Wildman,* 72 B.R. 700, 709 (Bankr.N.D.Ill.1987) and *In re Leonard Jed Co.,* 103 B.R. 706, 713 (Bankr.D.Md.1989),

["Lumping" is a] practice universally disapproved by bankruptcy courts for two reasons. One, it permits an applicant to claim compensation for rather minor tasks which, if reported individually, would not be compensable. Two, it prevents the Court from determining whether individual tasks were expeditiously performed within a reasonable period of time because it is impossible to separate into components the services which have been lumped together.

**16.** This determination is certainly not dispositive, or intended to affect, whatever fee arrangements and value of services Smith Barney and its counsel, L & W, agree on and conclude between themselves. That is a matter strictly between them.

**17.** ($43,888.25 − 22,615.75 = $21,272.50 × 50% = $10,636.25.)

| EXPENSE | ADJUSTED AMOUNT |
|---|---|
| Airfare | 733.00 |
| Photocopy | 709.28 |
| Fax | 559.50 |
| Lexis | 536.79 |
| Westlaw | 111.74 |
| Federal Express | 15.40 |
| Now Courier | 110.00 |
| Other Freight | 313.50 |
| Telephone | 300.94 |
| Parking | 21.83 |
| Postage | 0.29 |
| Doc Processing | 192.50 |
| Doc Support OT | 10.00 |
| Doc Support Night | 320.00 |
| Doc BR - NY/LA/OC/DC | 166.25 |
| CD - Rom Research | 4.00 |
| Total | $4,105.02 |

A. *Airfare.* L & W requests reimbursement for $733.00 in airfare. The time records indicate that only one trip took place whereby only Ms. Grogan came to Denver for the hearing on Smith Barney's Supplemental Application to be employed. This Court is provided with absolutely no documentation to substantiate this expense. Moreover, the amount requested appears to be excessive for one airplane ticket. The estate will not pay for airline upgrades. Air travel is expected to be at regular coach fare. *See,* Compensation Order at pp. 11–12. Absent the submission of documentation, or representations to the Court, sufficient to allay this Court's concerns, the request for reimbursement of airfare will be denied.

B. *Photocopies.* This Court has stated that "[p]hotocopying shall be reimbursable at $0.20 per page." Compensation Order at p. 11. Given this established rate of compensation, L & W's $709.28 request represents 3,546.4 copies. Not only does this amount result in an irreconcilable fraction of a document but it appears to be excessive as well. This Court will allow reimbursement for 2,000 copies or $400.00, absent explanation or documentation as to the necessity or reasonableness for the additional copies.[18]

18. This Court will assume that all copies for which reimbursement is requested were made in-house and were not contracted out to an independent printing establishment as neither

C. *Facsimile.* L & W requests reimbursement of $559.50 for facsimile transmissions. This amount is justified, it is argued, because of the numbers of draft applications and briefs L & W was required to file in this matter. The "Disbursement Detail" appears to substantiate that the facsimiles/telecopies were sent.[19] This Court must caution future applicants, however, that use of the facsimile machine is not an acceptable substitute for first-class mail. L & W is in Los Angeles while its client, Smith Barney, is in San Francisco, so this Court recognizes the value of such innovation *when used sparingly and only when necessary.*[20] This Court will allow the request.

*Computer–Assisted Legal Research.* Lexis and Westlaw expenses may be compensable where they are both necessary and attributable to a particular client. Ideally, the billing statements should indicate the date, the person conducting the search, the length of the search, as well as providing evidence of the necessity for the use of the service. It has been held that the

> [P]urpose of computer research is to cut down the amount of time necessary to research a particular issue, not to increase the costs. The same amount of research [could] have been ... done with digest books in the same amount of time ... and at no extra cost to the estates. [Unless] some showing is ... made that the use of computers to research cut down the total time necessary to research a particular issue, the Court will be inclined to find that the expense of computer research is not necessary.

*In re Wildman,* 72 B.R. 700, 732 (Bankr. N.D.Ill.1987).

Time savings can be established by describing to the Court the issue being researched. If the issue is sophisticated, and not "learning time" better obtained by using more conventional or routine methods, the charges will be compensable. *Accord, In re Wizard Enterprises, Inc.,* 109 B.R. 708, 710 (Bankr.W.D.La.1990).

This Court has reviewed the explanation of computer research time given in the Supplemental Application in conjunction with the time entries on the billing statements. Mr. Hall's four searches match up to time entries that contain generic statements such as "prepare memorandum of law in support of debtor's motion to employ S.B." The date of Ms. Grogan's search corresponds to a time entry "review cases re: success fees and indemnification issues." None of these entries even mention that any type of legal research was conducted, much less that the research was computer-assisted. L & W maintains that computer services were used only when expeditious. This Court, however, will not allow such an expense when the record is entirely bare; there is no showing that the expense was cost effective, reasonable and/or necessary.[21]

E. *Other.* "Daytime, ordinary business hour charges for secretarial, library, word processing and other staff services (exclusive of paraprofessional services) are not reimbursable unless such charges are not included in the applicant's overhead for the purpose of setting billing rates and such charges are customarily and

receipts nor a separate category appear in the Application.

**19.** From looking at the "Disbursement Detail," this Court gets the impression that Messrs. Edwards and Hall and Ms. Grogan actually, physically, placed the documents in the facsimile machine and directed their transmission. If this is so, and the time so expended was billed to the Debtor, this is yet another example of an unacceptable charge and of the improper delegation of ministerial tasks to professionals.

**20.** *See,* entry for July 17, 1991 on "Disbursement Detail" where eight facsimile transmissions orig-

inated at L & W's office for more than $88.00 in charges for that day alone.

**21.** As noted above, this Court believes that the time spent preparing the Memorandum was grossly excessive. This observation becomes particularly important when the Court notes that L & W holds itself out as highly expert and experienced in these matters and based upon its extensive activity in other similar cases and with similar issues. *See,* n. 13, *infra.* It is, therefore, doubtful that a time savings can be shown to have resulted from the use of these services.

routinely charged to and paid by the applicant's non-bankruptcy clients; in such cases the application shall so state." Compensation Order at p. 13. L & W requests reimbursement for $192.50 for "Doc Processing," which this Court presumes to mean document processing. The Supplemental Application maintains that such charges are compensable as they meet the criteria set forth above. While L & W may customarily bill and receive payment from their non-bankruptcy clients for such services, this Court fails to see how such billing rates as charged herein do not contain this element as traditional overhead. Many of these charges may also be unreasonably large due to the excessive time spent by Mr. Hall on the Memorandum. There are no documents submitted which enlighten this Court on this item. This Court has not been persuaded that this charge is reasonable and it will not be allowed.

■ "Doc Support OT" ($10.00) and "Doc Support Night" ($320.00) appear to be enhanced document processing fees for work done after normal business hours. "Overtime for non-professional . . . staff is not reimbursable unless justified. . . . Any such justification must indicate that (i) services after normal closing hours are absolutely necessary for the case, (ii) the charges are for overtime expenses paid, (iii) similar overtime expenses are customarily and routinely charged to non-bankruptcy clients." Compensation Order at p. 12. What little documentation that this Court has been provided, which is by no means complete, indicates that the work done for Smith Barney just happened to necessitate overtime because the work for other clients was done prior in the day to that for Smith Barney.[22] Further, there has been no showing that these expedited services were "absolutely necessary for the case." For these reasons, as well as for those reasons stated above, this Court will not allow these expenses.

This Court cannot allow the requested $166.25 for "Doc BR–NY/LA/OC/DC" or the $4.00 charge for "CD–Rom Research" because, not only have these items not been substantiated, but this Court cannot even determine to what category or type of expenses the entries refer.

In summary, until further information is supplied, this Court will allow only the following expenses:

| EXPENSE | ADJUSTED AMOUNT |
| --- | --- |
| Airfare | 0.00 |
| Photocopy | 400.00 |
| Fax | 559.50 |
| Lexis | 0.00 |
| Westlaw | 0.00 |
| Federal Express | 15.40 |
| Now Courier | 110.00 |
| Other Freight | 313.50 |

22. See, July 17, 1991 Work Log for a member of the secretarial staff, where the work for two other clients, Bunell and O'Mally, consumed an hour and 15 minutes and was completed prior to work beginning on the Smith Barney project, resulting in 15 minutes of overtime being charged to the instant estate.

| EXPENSE | ADJUSTED AMOUNT |
|---|---|
| Telephone | 300.94 |
| Parking | 21.83 |
| Postage | 0.29 |
| Doc Processing | 0.00 |
| Doc Support OT | 0.00 |
| Doc Support Night | 0.00 |
| Doc BR - NY/LA/OC/DC | 0.00 |
| CD - Rom Research | 0.00 |
| Total | $1,721.46 |

## V. CONCLUSION.

This Court will award to Latham & Watkins interim fee compensation in the amount of $16,486.25 and reimbursement of expenses in the amount of $1,721.46. Accordingly, it is

ORDERED that the First Quarterly Application of Latham & Watkins for Interim Allowance of Compensation and Reimbursement of Expenses as Counsel to Smith Barney, Harris Upham & Co., Financial Advisor for Gillett Holdings, Inc. is ALLOWED, IN PART, to the extent of $16,486.25 in fees and $1,721.46 in expenses, and DENIED, IN PART, to the extent of $27,402.00 in fees and $2,383.56 in expenses; and it is

FURTHER ORDERED that all amounts allowed hereby are subject to review and possible recapture following a final hearing on compensation and reimbursement.