**In re CUMBERLAND FARMS, INC., Debtor.**

**Bankruptcy No. 92–41305–JFQ.**

United States Bankruptcy Court,
D. Massachusetts.

May 7, 1993.

See also 142 B.R. 593.

Joel D. Applebaum, Pepper, Hamilton & Scheetz, Detroit, MI, for Unsecured Creditors Committee.

Timothy M. Lindamood, Sullivan & Worcester, Boston, MA, for Cumberland Farms, Inc.

Whitton E. Norris, III, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, for Price Waterhouse.

Robert P. Manzo, Policano & Manzo, Saddle Brook, NJ, for Policano & Manzo.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON FEE APPLICATIONS

JAMES F. QUEENAN, Jr., Chief Judge.

Cumberland Farms, Inc. (the "Debtor") filed their Chapter 11 petition in May of 1992. The matters under consideration are the First Interim Applications for Compensation and Reimbursement of Expenses by (1) Sullivan & Worcester ("S & W"), counsel to the Debtor, (2) Policano & Manzo ("P & M"), accountants and financial advisors to the Debtor, (3) Pepper, Hamilton & Scheetz ("PH & S"), counsel to the Official Unsecured Creditors' Committee (the "Committee"), and (4) Price Waterhouse ("PW"), accountants and financial advisors to the Committee. Each application covers the time period from May 1, 1992, the day the Debtor filed in this court, to November 30, 1992, or a seven-month period. Each professional has been paid 75% of its fee on a monthly basis and 90% of its expenses on a monthly basis pursuant to a procedural order assented to by the parties and approved by this court. The court approved employment of all the parties, reserving the right of final approval of their fees and expenses pursuant to the Bankruptcy Code.

The applicable law in this case is 11 U.S.C. § 330, which states in relevant part:

(a) After notice to any party in interest and to the United States trustee and a hearing, . . . the court may award to a . . . professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such . . . professional person, or attorney . . . and by any paraprofessional person employed by such . . . professional person, or attorney, . . . based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

The statute gives the bankruptcy court control over the professional representation surrounding the bankrupt estate to enable the court to contain the estate's expenses. *Land West, Inc. v. Coldwell Banker Commercial Group, Inc. (In re Haley)*, 950 F.2d 588, 590 (9th Cir.1991). In reviewing and awarding fee applications, the court must make a cost/benefit analysis. *In re Hutter Construction Co., Inc.*, 126 B.R. 1005, 1012 (Bankr.E.D.Wis.1991). The court has independent authority to review all fee applications as they affect the estate, regardless of whether an objection is filed. *In re Gillett Holdings, Inc.*, 137 B.R. 462, 466 (Bankr.D.Colo.1992); *In re Wildman*, 72 B.R. 700, 705 (Bankr.N.D.Ill. 1987) and cases cited therein. Indeed, the bankruptcy judge has the inescapable statutory responsibility to review applications for compensation. *Id.*

Based on section 330, bankruptcy courts have employed a three-part test in reviewing fee applications. Courts look to (1) whether the work represents actual compensation rather than overhead, (2) whether the work was necessary and (3) whether the charge is reasonable. *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 956–57

(9th Cir.1991); *In re Gillett Holdings, Inc.*, 137 B.R. at 466; *In re Wildman*, 72 B.R. at 704–05. Sufficient information must be presented by the applicant to enable the court to analyze a fee application. Fed. R.Bankr.P. 2016(a); Local Rule of Bankruptcy of the District of Massachusetts, Appendix II. The burden of proving the value of the services for which compensation is sought is on the applicant, for every dollar spent on professional fees is one fewer for the creditors. *See In re Gillett Holdings, Inc.*, 137 B.R. at 466, and cases cited therein. Although I review each fee application separately, the comments are not mutually exclusive.

■ With these criteria in mind, I first review the fee application submitted by S & W. S & W requests $1,012,559.75 in fees and $154,071.12 in expenses. I award S & W $994,770.67 in fees and $154,071.12 in expenses. S & W divided its fee application into 34 separate billing categories. Unfortunately, many professionals at S & W have used category # 31 "Chapter 11— General Matters" as a billing dumping ground. A total of $355,781.50 has been charged to this account. Some of the charges should have been billed to other more specific categories. Such a general category, though needed in all billing, can lead to over-generalization in billing, double billing and makes the review of the fee application very difficult. For this, I have reduced S & W category # 31 by 5%.

■ Next is the fee application of P & M. P & M seeks $1,158,378.50 in fees and $35,284.01 in expenses. I award P & M $1,042,540.65 in fees and $35,284.01 in expenses. The fees are reduced 10% overall. Generally, I find that P & M became overly involved in legal issues which are, and should be, handled only by S & W. I see no need, for example, to have the Debtor's accountants involved to the extent P & M was in cash collateral negotiations and reclamation claims. Furthermore, accountants and financial advisors are hired to *advise* the Debtor and assist the Debtor's counsel, S & W. Negotiations with the secured creditors, for which P & M billed over 621 hours, and negotiations with the unsecured creditors, for which P & M billed an additional 284 hours, is better left primarily to Debtor's counsel.

■ I next address the fee application by PH & S. PH & S requests $521,213.50 in fees and $55,701.85 in expenses. First, it is the general policy of this court to award all professionals 50% of their usual rate for preparing and presenting a fee application. This is on the theory that nonbillable time is always spent in preparation and collection of a lawyer's bills, and yet more detail and formality is required in bankruptcy. While this has been this court's policy for many years, there are always some exceptions. In the application by PH & S, PH & S requests only $2,837.50 for creating their fee application. This is a lower than average request for the job due to the fact that PH & S used a paralegal to create 99% of the fee application. For this efficiency, PH & S will be awarded its full fee for creating the fee application. I award PH & S the $521,213.50 in fees they request and $55,701.85 in expenses.

■ A cautionary note for the next fee application: PH & S expenses were very difficult for this court to analyze. I request that all expenses be listed as they occur, and tallied into categories such as travel, lodging, copying charges (with a per page rate) and so forth, setting out the total for each category. Such a total must accompany each and every expense reimbursement application in order for the expenses to be awarded by this court. See *In re Bank of New England*, 134 B.R. 450 (Bankr.D.Mass.1991) for additional information on expenses in fee applications.

Finally, I come to the fee application of PW. PW seeks $1,276,226 in fees and $41,639 in expenses. I award PW 75% of the fees requested and 90% of the expenses requested.[1] PW has already received this amount.

■ I have great difficulty understanding how the accountants and financial advisors to the Committee could bill more in

---

**1.** As I calculate it, $957,169.50 in fees and $31,229.25 in expenses.

the initial seven month period of a bankruptcy filing than the Debtor's own attorneys. PW has been overly involved in this case. Although PW states it merely worked on what the Committee requested, there is no justification for such an exorbitant fee request. PW and the Committee must resolve this issue immediately.

This is not a difficult or complex case from the Committee's point of view. The Debtor has been forthcoming with information. There have been no allegations that the Debtor has inadequate records, or that it has been uncooperative. Nor have any facts been alleged supporting a need for the Committee to conduct its own investigation of possible causes of action against insiders for which the debtor would have a conflict of interest.

PW has acted as though it has been employed as management consultants to analyze every facet of the Debtor's operations, rather than as accountant and financial advisor to the Committee. For example, PW need not scrupulously review every asset sale entered into by the Debtor. PW billed $13,842 under the category "Asset Sales", but in a different category PW bills an additional $16,050 for the Buffalo sales, $1,822 for the proposed Plymouth real estate sale and $1,512 for the Watertown Dairy operations sale.

PW must limit the issues it deems necessary to investigate. For example, in the category "Business Plan—Plants Division—Dairy" PW in its work description states: "An extremely thorough analysis of these operations was required due to the potential marketability of these assets as well as the strategic significance of the dairy products business in the Debtor's Business Plan." Yet in the next sentence PW recognizes the Debtor intends to retain the dairy operations. "One of the key components of the Debtor's Business Plan is the assumption that the Dairy Plants will enable the Company to price its milk products at a retail level that will generate both significant volume and traffic at C-stores." Obviously, the Dairy component of the Debtor is vital to its operations. The Debtor made it clear that it intends to retain the dairies. PW therefore need not extensively investigate at this time the marketability of the Dairy. All PW should have analyzed for now is whether the Debtor's income assumptions were reasonable. Similar analysis of non-issues is prevalent throughout PW fee application.

■ PW has been retained to advise the creditors' committee in their duties. The three basic functions of a creditors' committee are (1) to monitor the Debtor's operations, (2) to investigate for potential insider causes of action where the facts warrant it, and (3) to negotiate on the plan. 11 U.S.C. § 1103. Monitoring the Debtor does not give PW a free license to involve itself in every minute aspect of the Debtor's business. PW and the Committee must make an educated decision on which aspects of the case merit their heavy involvement. This would entail a review of the Debtors' general business operations. PW has billed $359,624 to review the Debtor's Business Plan. This in itself is excessive.

In addition to the $362,624 PW charged to review and analyze the Debtor's Business Plan, PW has charged for work in other categories which duplicates work charged in "Business Plan" and/or over involves PW in the case. For example, PW charged $62,956 to "Business Plan—Gulf Division" describing the work as: PW utilized "senior members of its Corporate Finance organization" to "fully evaluate the proposed joint venture" and "evaluate the historical margins and volumes of gasoline sold to various customer classes." In addition to this charge PW billed:

$23,448 to "Gulf Division—Business Unit"
$ 8,148 to "Gulf Division—Customers"
$22,275 to "Gulf Division—Operations"
$ 7,692 to "Gulf Division—History"
$ 8,151 to "Gulf Division—Margins"
$18,355 to "Gulf Division—Overview"
$ 3,168 to "Gulf Division—Terminal and Distribution Issues"
$15,540 to "Gulf Division—Valuation"

Together PW billed an additional $106,777 to review the Gulf Division over and above the charges for the review done in the Business Plan. Either its time is not being wisely expended and accounted for or PW

has over involved itself in issues not of their concern.

This is not the only example of over-analysis. PW charges $74,302 to "Business Plan—Stores Division." It also charges $19,379 to "Chain Level Analysis of CFI stores," $36,951 to "Regional Level Analysis of CFI Stores," $25,995 to "Historical Analysis of CFI Financial Information" and finally $1,001 for "Review of the Trend of the Number of C-stores and Gulf Stations." This makes a total of $83,326 in addition to the comprehensive analysis charged for under the heading "Business Plan." Other examples abound.

■ PW charged $60,321 to create its first fee application. This is an enormous fee for these services compared to other fee applications. A fee application generally entails the simple compilation of time already recorded by the professionals with the addition of biographical and summary narratives. PW also charges $19,579 for time administration. This is clearly overhead and not billable.

The Debtor has filed an objection to the PW fee application. The Debtor asserts PW has overly staffed the case, which has led to duplication of work and other pitfalls arising from having too many cooks in the kitchen. PW responds that it had a core team of twelve on this case and it only involved others when their special knowledge was required. Without going into further needless detail, I conclude the Debtor's objection has merit.

I am sufficiently troubled by the PW fee application to consider terminating or curtailing its employment, with perhaps the Debtor's accountants taking up the slack. A hearing will be scheduled on that issue at an appropriate time. In the meantime, I have by separate order terminated PW's right to collect 75% of its monthly request.

A separate order has entered today awarding the above fees and expenses.